PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OBX-STOCK, INCORPORATED,

       *Plaintiff-Appellant,*

v.

BICAST, INCORPORATED,

       *Defendant-Appellee.*

No. 06-1769

OBX-STOCK, INCORPORATED,

       *Plaintiff-Appellee,*

v.

BICAST, INCORPORATED,

       *Defendant-Appellant.*

No. 06-1887

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(2:04-cv-00045-BO)

Argued: October 31, 2008

Decided: February 27, 2009

Before NIEMEYER and AGEE, Circuit Judges, and Liam
O'GRADY, United States District Judge for the Eastern
District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee and Judge O'Grady joined.

---

## COUNSEL

**ARGUED:** Alice Carmichael Richey, K&L GATES, L.L.P., Charlotte, North Carolina, for Appellant/Cross-Appellee. Pamela Anne Bresnahan, VORYS, SATER, SEYMOUR & PEASE, Washington, D.C., for Appellee/Cross-Appellant. **ON BRIEF:** Daniel V. Mumford, KENNEDY, COVINGTON, LOBDELL & HICKMAN, L.L.P., Charlotte, North Carolina, for Appellant/Cross-Appellee. Elizabeth Treubert Simon, VORYS, SATER, SEYMOUR & PEASE, Washington, D.C.; Reid L. Phillips, David W. Sar, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellee/Cross-Appellant.

---

## OPINION

NIEMEYER, Circuit Judge:

James Douglas, the founder of OBX-Stock, Inc., cleverly invented "OBX" as an abbreviation for the "*O*uter *Ba*n*ks*" of North Carolina. OBX-Stock began using the letters OBX on oval stickers for automobiles to indicate that the automobile was from or had visited the Outer Banks. The letters were also attached to souvenirs and other sundries to indicate that they were sold at the Outer Banks.

OBX-Stock has been successful in making money selling products with the OBX letters affixed to them, and it obtained trademark registrations from the Patent and Trademark Office for "OBX" for use in connection with a range of goods and services. Nonetheless, today, virtually every kind of business

advertising at the Outer Banks identifies the Outer Banks geographical area with the "OBX" abbreviation.

When Bicast, Inc., began selling stickers with the text "OB Xtreme," OBX-Stock commenced this trademark infringement action, requesting an injunction prohibiting the defendant from using "OB Xtreme" and demanding damages. The district court granted summary judgment in favor of Bicast, finding that "OBX" was either generic or a descriptive mark without secondary meaning and therefore was not a valid trademark, but the court declined to order cancellation of the trademark registrations. We affirm.

I

The Outer Banks of North Carolina is a geographical region consisting of approximately 200 miles of barrier islands off the coast of North Carolina. The Outer Banks, which encompasses several counties and numerous towns, is a major attraction for vacationers, windsurfers, paragliders, hang gliders, as well as sunbathers and swimmers.

In 1994, James Douglas coined the abbreviation OBX as a designation for the Outer Banks. His idea was prompted by a similar abbreviated designation for Nantucket and the oval automobile stickers used in Europe to identify countries. Douglas began putting OBX in black letters on white oval stickers to put on automobiles, and initially he gave these OBX stickers away for free. While recipients were at first confused, following some persistence, the stickers and the abbreviation caught on beyond Douglas' most ambitious expectations. He not only placed the letters on oval stickers, but formed a business corporation, OBX-Stock, and expanded the use of OBX to affix the letters to a wide range of items being sold from the Outer Banks. Over the period from 1997 to 2004, OBX-Stock spent a total of $173,000 on advertising, promotion, and sponsorships, and the corporation has become

financially successful, with an annual revenue in 2004 exceeding $1 million.

When questioned about the intended significance of the OBX letters, Douglas testified that they were used by OBX-Stock to "signify a geographic location." Thus when asked, "[I]s it fair to say that you hope that consumers seeing your OBX stickers would think of the geographic region Outer Banks?" Douglas responded, "Yes." When asked what his product was and, more particularly, whether it was the oval logo including the letters OBX, Douglas stated that the company's product "was actually the OBX in general since it had not been used before." Explaining how his product was understood, he testified:

> Q. Did you have communications about what OBX signified?
>
> A. Yes.
>
> Q. Thank you. Could you tell me about those communications?
>
> A. It stood for the Outer Banks.

As a result of OBX-Stock's efforts in promoting OBX as a designation for the Outer Banks, the businesses and residents of the Outer Banks have come to use the abbreviation OBX on a daily basis to refer to the Outer Banks. Local headlines have read, "An OBX Institution Says Goodbye," and "Contest winner fell under OBX spell." By 2005, thousands of website domain names incorporated OBX into their name, ranging from obxnews.com to obxnightclubs.com. Businesses use OBX to describe their location such as, "Best Pizza in OBX" or "Enjoy the OBX With Us." Those wishing to charter a sailboat can call 1-866-SAIL-OBX, while a local business directory says "Welcome to Obx On-Line, your source to the Outer Banks Businesses." Individuals advertise vacation rent-

als with "OBX by Owner," while realtors "Welcome OBX Homeowners." There is an OBX Swim Club, an OBX Nudist Club, and an online forum discussing OBX fishing. The initials OBX are omnipresent in the Outer Banks and are universally understood as an abbreviation for "Outer Banks."

Beginning in 1998, OBX-Stock began efforts to register "OBX" as a trademark on the Principal Register of the Patent and Trademark Office ("PTO"). The PTO examiners, however, repeatedly rejected OBX-Stock's applications, stating, "At one time OBX may have been an obscure reference to the Outer Banks of North Carolina, however those days are no more." The examiner cited extensive evidence "wherein OBX and OUTER BANKS are used interchangeably." After repeated, unsuccessful efforts, OBX-Stock enlisted the assistance of North Carolina's congressional delegation, and the PTO then granted OBX-Stock four registrations for "OBX" on the Principal Register in connection with several classes of products and services, including stickers, sports clothing, tourist sundries, bottled drinking water, entertainment services, ethnic festivals, and sporting events.*

After obtaining trademark registrations, OBX-Stock undertook efforts to police its trademarks, sending out cease-and-desist letters. But the evidence demonstrates that the extensive use of OBX made these attempts futile.

Bicast, Inc., was the target of one of the OBX-Stock's cease and desist letters because it sold oval stickers bearing "OB Xtreme" in pink cursive script. While Bicast had long

---

*The registrations on the Principal Register have the following Registration Numbers: No. 2,593,347 (covering "metal license plates" and "sports clothing"); No. 2,837,794 ("stickers"); No. 2,939,252 ("entertainment services in the nature of conducting and sponsoring music festivals, chili cook-off contests, ethnic festivals, and sporting events, namely, fishing contests and boat racing"); and No. 3,137,690 ("magnets and computer mouse pads," "non-metal key rings," "beverage glassware, bottle openers and bottle squeegees," and "bottled drinking water").

sold products bearing "OB" for the Outer Banks, in 2003, it began producing stickers that added the "Xtreme" language to denote the wide variety of extreme sports available at the Outer Banks. When Bicast refused OBX-Stock's demand to cease and desist, OBX-Stock commenced the present action.

On Bicast's motion, the district court granted summary judgment in favor of Bicast, concluding that the overwhelming evidence showed that OBX had become either generic or geographically descriptive without secondary meaning. Under either theory, it held, the mark was invalid and hence could not be infringed. The district court, however, declined Bicast's request, under 15 U.S.C. § 1119, to cancel the OBX trademarks from the Principal Register.

From the district court's judgment dated June 11, 2006, OBX-Stock filed this appeal, challenging the summary judgment entered in favor of Bicast, and Bicast filed a cross-appeal, challenging the district court's refusal to cancel the OBX registrations.

## II

In finding for Bicast, the district court concluded that OBX-Stock "ha[d] not established ownership in a valid trademark" because it failed to present any evidence of secondary meaning. The court noted that the evidence indicated overwhelmingly that "OBX" is "a geographically descriptive or generic term for the Outer Banks" and that no evidence was presented to show that "any consumer associates OBX with Plaintiff's products or Plaintiff itself." It accordingly granted summary judgment in favor of Bicast on all of OBX-Stock's claims because their success depended on ownership of a valid trademark.

On appeal, OBX-Stock contends that the geographical descriptiveness of OBX is not its fault:

If any geographic connotation to the OBX Mark has developed over time, it is attributable to the efforts of Douglas and OBX-Stock and the ensuing success of the goods sold under the mark. Indeed, the District Court noted that "Plaintiff's efforts to market OBX car stickers and other products have been largely responsible for the term's ubiquity." A trademark owner, whose "efforts (whether directly through advertising or indirectly through publicity)" develop commercial success for goods, should not be punished because its mark has become associated with a geographic location.

(Citations omitted). Yet OBX-Stock fails to address specifically the absence of evidence of secondary meaning. It suggests that the universal recognition of OBX as an abbreviation for Outer Banks through OBX-Stock's promotions and use of the term on a broad array of products provides evidence of secondary meaning. It states:

The extensive media coverage of a relatively small business indicates the success of marketing the OBX Mark as an indicator of a single source for, among other things, license plates, sports clothing and "that famous sticker" bearing the mark. It is clear that the public would understand the products to come from a source which owns some form of rights to the OBX Mark.

Trademark law, at a general level, protects the goodwill represented by particular marks, enabling consumers readily to recognize products and their source and to prevent consumer confusion between products and between sources of products. The marks enable consumers to make informed, independent decisions about quality and other product characteristics. But the law also protects the "linguistic commons" by denying mark holders an exclusive interest in words that do not identify goodwill attached to products or product

sources but rather are used for their common meaning or meanings not indicative of products and product sources. *See America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 821 (4th Cir. 2001); *see generally* 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 1:27 (4th ed. 2008).

To balance these competing interests, trademark law has developed a spectrum of the "distinctiveness of marks." *See generally* 2 McCarthy, *supra*, §§ 11:1-2. In declining order of distinctiveness, marks are referred to as (1) arbitrary or fanciful, (2) suggestive, (3) descriptive, or (4) generic. *Id.* The more distinctive a mark, the more protection it receives.

Thus, "arbitrary" marks are based on existing words used in ways unconnected with their common meaning, such as APPLE computer or SHELL gasoline. "Fanciful" marks are made-up words that are invented to describe the product or source, such as KODAK or EXXON. Arbitrary and fanciful marks clearly do not threaten the linguistic commons, as they are considered inherently distinctive and therefore valid without the holder having to make any other showing. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 464 (4th Cir. 1996).

"Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product," such as L'EGGS pantyhose and GLASS DOCTOR window repair. *Sara Lee*, 81 F.3d at 464-65; *see also Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 172 (4th Cir. 2006). Suggestive marks are also considered inherently distinctive and valid.

"Descriptive" marks "merely describe a function, use, characteristic, size, or intended purpose of the product," such as YELLOW PAGES telephone directories and 5 MINUTE glue. *Sara Lee*, 81 F.3d at 464. And this class of marks includes those that are geographically descriptive, such as BOSTON beer produced by a Boston-based brewer, BANK OF AMERICA, and MISS U.S.A. No descriptive mark can

serve as a valid trademark without evidence of secondary meaning. *Barcelona.com, Inc. v. Excelentisimo Ayuntamientod de Barcelona*, 330 F.3d 617, 629 (4th Cir. 2003). "Secondary meaning" in connection with geographically descriptive marks means that the mark no longer causes the public to associate the goods with the geographical location, but to associate the goods with a particular product or source of the product. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir. 1998); *Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st Cir. 1993); *see generally* 2 McCarthy, *supra*, §§ 15:1-5. In this manner, KENTUCKY fried chicken and AMERICAN airlines are geographically descriptive marks that have established secondary meanings in consumers' minds, causing consumers to recognize a brand or source of fried chicken or air travel, rather than the places, Kentucky and America.

"Generic" words, which are "the common name of a product" or "the genus of which the particular product is a species" can never be valid marks under any circumstances. *Retail Services, Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004) (quoting *Park 'N' Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). Thus LITE BEER for light beer, CONVENIENT STORE for convenience stores, and POLO shirts for polo shirts cannot serve as trademarks.

In this case, the letters OBX had the potential of becoming a valid and enforceable trademark to identify an OBX brand product and OBX-Stock as the source of the product. But from the beginning, Douglas, the inventor of "OBX," never intended that OBX become associated with a product as its brand or source. Rather, Douglas intended solely that OBX become associated with and descriptive of a geographical location, the Outer Banks. He repeatedly stated this fact in his deposition, and he continues to maintain it in arguments made to us. As he states in his briefs, "OBX-Stock created a new term that would suggest the Outer Banks"; "Douglas wanted to print and sell white oval stickers like the ones used in

Europe to display country of origin but with a mark that would suggest the Outer Banks of North Carolina to customers"; "Although Douglas wanted to conjure images of the Outer Banks, he did this through a fictional word without prior meaning." (Citations omitted).

And just as important, OBX-Stock affixed the letters OBX to stickers, souvenirs, and other sundries *not* to label an OBX brand product produced by OBX-Stock, but to indicate an association with the Outer Banks. Douglas testified that this purpose had its effect—persons learning of the significance of OBX did indeed associate OBX with the Outer Banks. Most dramatically, OBX did, as intended, become a commonly accepted abbreviation for "Outer Banks," and thus became a geographically descriptive abbreviation. Bicast produced overwhelming evidence in the district court demonstrating that OBX entered the "linguistic commons" as an often-used, everyday abbreviation of "Outer Banks." Indeed, many Outer Banks businesses sell clothing, bottled water, and various other goods and services bearing "OBX." When affixed to any product or service, the evidence suggests that OBX merely denoted the geographical origin, Outer Banks. Thus, at bottom, when OBX-Stock affixes the letters "OBX" to stickers, souvenirs, and other products, it is merely communicating the fact that the sticker or product comes from the Outer Banks, and that was Douglas' intent all along.

But that is not the secondary meaning that allows a geographically descriptive word to indicate, by usage and promotion, a product or source of product. A T-shirt with OBX on it does not indicate that the consumer bought an OBX brand T-shirt or that the T-shirt was a product of OBX-Stock. Rather, the letters OBX indicate that the T-shirt was purchased at the Outer Banks of North Carolina or is promoting the Outer Banks.

In *Resorts of Pinehurst*, we pointed out that PINEHURST had a clear secondary meaning in consumers' minds, making

it an enforceable trademark even if it might have been geographically descriptive. Resorts of Pinehurst communicated its name to the consuming public effectively to associate the name with a private provider of golf courses and golf services, and not the geographical location in North Carolina. As we noted, "[S]econdary meaning has been established in a geographically descriptive mark where the mark no longer causes the public to associate the goods with a particular place, but to associate the goods with a particular source." 148 F.3d at 421 (citation and quotation marks omitted) (alteration in original).

In this case, the district court properly characterized the record when it concluded that "[t]here is simply no evidence in the record of this case that any consumer associates OBX with Plaintiff's products or Plaintiff itself." OBX-Stock never attempted to associate the geographically descriptive abbreviation for Outer Banks with its products or itself, but rather with the Outer Banks.

OBX-Stock argues that its four certificates of registration on the Principal Register of the PTO provide evidence of secondary meaning. It is true that a certificate of registration serves as prima facie evidence of the validity of the registered mark. *See* 15 U.S.C. § 1057(b); *America Online*, 243 F.3d at 816-18. But entry on the Principal Register does not shift the burden of persuasion on validity, merely the burden of production. *See Retail Servs.*, 364 F.3d at 542.

In this case, all of the evidence points to the conclusion that the letters OBX were adopted, promoted, and received by the public as an abbreviation for "Outer Banks" and that therefore it can, at best, be only a geographically descriptive mark. But for a descriptive mark to be a valid trademark, it must have secondary meaning in the public's eye that OBX does not refer to the Outer Banks but rather to products of OBX-Stock. Yet there is no evidence of this.

Moreover, whatever support OBX-Stock might be able to claim from the registrations is in this case undermined by the fact that the PTO only grudgingly issued the registrations after intervention by North Carolina's congressional delegation. As Douglas told the *Outer Banks Sentinel*, "Things really started to happen after we contacted their offices. We are very fortunate to have extremely efficient and powerful legislative representatives." Before then, the PTO examiners rejected OBX-Stock's application five times because the letters OBX had become nothing more than an alternative to Outer Banks and the terms were used "interchangeably."

These observations about the prosecution before the PTO are particularly poignant inasmuch as the examinations by the PTO are mostly conducted *ex parte*, and applicants have the luxury of repeated attempts. In the patent context, the courts have taken into consideration analogous circumstances as non-technical evidence of patent obviousness and hence invalidity. *See, e.g.*, *Philips Elec. & Pharm. Indus. Corp. v. Thermal & Elecs. Indus., Inc.*, 450 F.2d 1164, 1174-75 (3d Cir. 1971); *see generally* 2 Donald S. Chisum, *Chisum on Patents* § 5.05[6] (2008). Conversely, quick progress through the PTO weighs in favor of validity. *See United States v. Adams*, 383 U.S. 39, 52 (1966). This reasoning also applies to the progress of a trademark application for inclusion on the Principal Register.

At bottom, we conclude that the district court did not err in concluding that OBX is a geographically descriptive abbreviation that has no secondary meaning and therefore is not a valid trademark.

### III

In its cross-appeal, Bicast argues that the district court abused its discretion in failing to order the PTO to cancel OBX-Stock's registrations under 15 U.S.C. § 1119. *See Central Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007)

(reviewing decision to order cancellation under § 1119 for abuse of discretion); *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 9 F.3d 1091, 1098-99 (4th Cir. 1993) (noting that in cancelling under § 1119, a "court is still required to exercise reasonable judicial discretion" (citation and internal quotation marks omitted)).

In its opinion, the district court concluded that Bicast's "evidence does not conclusively establish that every one of [OBX-Stock's] trademark registrations should be cancelled." Moreover, the court noted, Bicast never filed a counterclaim for cancellation, choosing simply to argue the point as part of its motion for summary judgment on OBX-Stock's claims. *Cf.* 37 C.F.R. §§ 2.106(b), 2.114(b) (making a cancellation claim before the PTO a compulsory counterclaim); *see generally* 5 McCarthy, *supra*, § 30:109.

Bicast has received an adequate remedy through the district court's summary judgment in its favor, and the court's final adverse decision on trademark validity will preclude OBX-Stock's marks from becoming incontestable. *See* 15 U.S.C. § 1065(1). In the totality of the circumstances, therefore, we do not find that the district court abused its discretion.

Accordingly, the judgment of the district court is

*AFFIRMED*.