# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-1762

_____

Sturgis Motorcycle Rally, Inc.

*Plaintiff - Appellee*

v.

Rushmore Photo & Gifts, Inc.; JRE, Inc.; Carol Niemann; Paul A. Niemann; Brian M. Niemann; Wal-Mart Stores, Inc.

*Defendants - Appellants*

_____

No. 17-1869

_____

Sturgis Motorcycle Rally, Inc.

*Plaintiff - Appellant*

v.

Rushmore Photo & Gifts, Inc.; JRE, Inc.; Carol Niemann; Paul A. Niemann; Brian M. Niemann; Wal-Mart Stores, Inc.

*Defendants - Appellees*

_____

No. 17-2712

_____

Sturgis Motorcycle Rally, Inc.

*Plaintiff - Appellee*

v.

Rushmore Photo & Gifts, Inc.; JRE, Inc.; Carol Niemann; Paul A. Niemann; Brian M. Niemann; Wal-Mart Stores, Inc.

*Defendants - Appellants*

_____

No. 17-2731
_____

Sturgis Motorcycle Rally, Inc.

*Plaintiff - Appellant*

v.

Rushmore Photo & Gifts, Inc.; JRE, Inc.; Carol Niemann; Paul A. Niemann; Brian M. Niemann; Wal-Mart Stores, Inc.

*Defendants - Appellees*

_____

Appeals from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: June 14, 2018
Filed: November 2, 2018

_____

Before WOLLMAN, ARNOLD, and KELLY, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Since 1938, a motorcycle rally has occurred almost every August in and around the City of Sturgis, South Dakota. It was the brainchild of Clarence "Pappy" Hoel, who in the late 1930s owned the local Indian motorcycle dealership and founded a local motorcycle club, the Jackpine Gypsies. To this day, the Jackpine Gypsies host the motorcycle races around which the rally first began. By the late 1970s, the rally was attracting several thousand people each year to the Black Hills of South Dakota, and the rallygoers had started to attract independent vendors, who sold them rally-related souvenirs like t-shirts, pins, and other knickknacks. In 1986, Tom Monahan, a local artist and vendor, donated a composite mark for the rally to the Sturgis Area Chamber of Commerce, which had recently accepted a central role in promoting the rally: One of the rally's supporters had joined forces with the Chamber, turning it into the primary source of information for people interested in attending.

In 1987, the Chamber debuted a licensing program for the Monahan mark. The mark is in the shape of a circle horizontally bisected by two motorcycles and the word "Sturgis." The words "Black Hills Motor Classic" are written in an arc pressed against the upper bounds of the circle. Filling in the rest of the circle's upper half are ten stars, also in an arc, and the head of a bird of prey in profile, facing right. In its lower half, six buffalo walk along the circle's edge. Written above them, in a curve parallel to the circle's lower edge, are the words "Rally & Races Black Hills S.D." Finally, a couple feathers dangle from each end of the section that bisects the circle. The Chamber advertised that products displaying the mark could be called "officially licensed." The Chamber registered the mark federally in 1996 and, in the 2000s, acquired two word marks that some rally vendors had also registered federally: "Sturgis Bike Week" and "Take the Ride to Sturgis." These three marks are only some of the many words and designs that vendors have used to associate their goods and services with the rally, which has come to be known by many names, including just "Sturgis."

The Sturgis motorcycle rally is now the largest such rally in the world, bringing several hundred thousand people and many millions of dollars into the region each year. In 2010, the Chamber assigned its rally-related marks to Sturgis Motorcycle

Rally, Inc. (SMRI), an entity it helped create that year. SMRI's sole purpose is to license its marks to others. It, as the Chamber did before it, advertises that the profits from its licensing program will go to support the City of Sturgis. The Chamber used that sales pitch for decades to convince vendors to buy a license to display the Monahan mark on their rally-related goods. Today, however, the licensing program seeks to control virtually all rally-related merchandise, asserting that if a vendor wants to sell an item using the geographic terms "Sturgis" or "Black Hills" in conjunction with the rally, he must first apply for and receive a license from SMRI that will cost him about eight percent of the wholesale price of each item sold.

Paul and Carol Niemann, along with their son Brian Niemann, own Rushmore Photo & Gifts, Inc., a souvenir provider in Rapid City, South Dakota, that for years sold a long line of goods related to the rally, including some that it used to advertise were "officially licensed" even though they were not. With the sole exception of some postcards it once created that displayed the Monahan mark, Rushmore has not asked the Chamber or SMRI for permission to sell its rally-related products, many of which display the word "Sturgis" or the name "Sturgis Motor Classic." In 2011, on receiving a federal registration for the word mark "Sturgis" when used on goods and services related to the rally, SMRI sued Rushmore, the Niemanns, JRE, Inc. (a dissolved South Dakota corporation that Paul and Carol Niemann had owned), and Wal-Mart Stores, Inc. (which had retailed some of Rushmore's rally-related products). In its amended complaint, SMRI alleged that the defendants, through their participation in the selling of Rushmore's unlicensed rally-related products, had violated several provisions of the Lanham Act, *see* 15 U.S.C. § 1051 *et seq.*, and related South Dakota statutes. The defendants, in their answer, filed several counterclaims against SMRI.

A jury rendered a verdict in favor of SMRI, awarding it $912,500 in damages. The district court largely denied the defendants' motion for judgment as a matter of law, but granted it as to JRE since JRE is a dissolved corporation without any assets. The district court also held that SMRI is estopped by laches and acquiescence from recovering damages from the defendants. The district court entered a permanent

-4-

injunction against the remaining defendants and awarded SMRI some costs, but not fees. The defendants appeal from the judgment below, and SMRI cross-appeals from several of the district court's orders.

## I

As an initial matter, SMRI maintains that we should vacate the district court's decision on the defendants' motion for judgment as a matter of law because their post-verdict renewal of it was defective. SMRI contends that it was defective because even though the defendants timely filed it, *see* Fed. R. Civ. P. 50(b), they did not submit a brief in support of it until after the trial transcript had been docketed, a process that took more than four months. SMRI appears to assume that a motion is defective under Federal Rule of Civil Procedure 7(b)(1)(B) if a supporting brief is not filed during its filing period. But that is not so. Rule 7(b)(1)(B) provides only that the motion must "state with particularity the grounds for seeking the order" requested. In their Rule 50(b) motion, the defendants set forth nine grounds for their request. We have held that a Rule 50(b) motion satisfies Rule 7's particularity requirement when the Rule 50(a) motion being renewed had satisfied it. *See Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008). SMRI does not contend, however, that the defendants' Rule 50(a) motion did not provide it with sufficient notice of their arguments or a meaningful opportunity to respond, the twin purposes behind Rule 7(b)(1)(B). *Id.* at 983. Since it appears that the defendants' Rule 50(a) motion stated with particularity the grounds for relief that they renewed in their Rule 50(b) motion, we conclude that the district court properly considered the defendants' renewed motion.

SMRI argues that the district court also erred in holding that the defendants are not estopped from challenging the validity of its marks despite the fact that Rushmore once licensed the Monahan mark from the Chamber. Licensee estoppel is an equitable doctrine, *see* Restatement (Third) of Unfair Competition § 33 cmt. d (Am. Law. Inst. 1995), and we have apparently not addressed what standard of review applies here. The parties do not address the issue, either, but since we hold that the district court did not err, we leave the question of the standard of review for another day.

Licensee estoppel precludes only licensees of a mark from contesting it; "other parties, even those closely affiliated with the licensee, are not foreclosed." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1150 (8th Cir. 2011). So, at most, the doctrine would apply to Rushmore, leaving the other defendants free to challenge SMRI's marks. Although "an alter ego of the licensee . . . may also be estopped from challenging" the licensed mark, *id.*, SMRI does not argue that any of Rushmore's co-defendants are its alter ego. Rushmore, moreover, licensed only the Monahan mark from the Chamber. The license's preamble, to be sure, stated that the Chamber owned not only the Monahan mark, but "the protected language 'Black Hills Motor Classic', 'Sturgis Rally & Races' and 'Black Hills Motorcycle Rally & Races.'" SMRI contends that by signing that agreement Rushmore admitted that all of the Chamber's marks are valid. The rule of licensee estoppel, however, generally covers only the mark that the licensee has agreed "to use" since by agreeing to pay to use it "the licensee effectively recognizes [its] validity." *See Idaho Potato Comm'n v. M&M Produce Farm & Sales*, 335 F.3d 130, 135 (2d Cir. 2003). That assumption, however, is problematic because there are many reasons someone might seek to license a property the validity of which he doubts: It may, for example, be more economically efficient to agree to a license in the short term than to litigate the mark's validity immediately. *Cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 585 n.18 (1994). It would be antithetical in any event to the pro-competitive purposes of trademark law, *see Matal v. Tam*, 137 S. Ct. 1744, 1752 (2017)*,* to allow a licensor to lay claim to marks that its licensees have not used by inserting superfluous language into its licensing agreements. So, at most, the 1999 license might prevent Rushmore from challenging the validity of the Monahan mark—a mark that the defendants do not challenge. We thus conclude that the district court did not err in declining to apply licensee estoppel against the defendants.

II

The jury found that the defendants as a whole had infringed five of SMRI's marks: its federally registered "Sturgis" and "Sturgis Bike Week" word marks, its federally registered Monahan mark, and its unregistered "Sturgis Motorcycle Rally" and "Sturgis Rally & Races" marks. The district court denied the defendants' motion

for judgment as a matter of law as to those infringement claims, and we review its decision *de novo*, viewing the record in a light most favorable to the verdict. *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018). "The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *Matal*, 137 S. Ct. at 1751. "To prove a trademark infringement claim, a plaintiff must show that it has a valid, protectible mark and that there is a likelihood of confusion between its mark" and the marks that the defendants were using. *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009); *see also* 15 U.S.C. § 1125(a)(1)(A).

## A

SMRI has two federal registrations for the "Sturgis" word mark, but it appears that the certificate of registration for only one of them, *see* "Sturgis," Registration No. 3,923,284, was admitted into evidence. The certificate says that the mark is registered under Section 2(f) of the Lanham Act, which applies to a mark that is not inherently distinctive, but "has become distinctive" of the registrant's goods based in part on his "substantially exclusive and continuous use thereof as a mark." 15 U.S.C. § 1052(f). Where, as here, a trademark holder has submitted evidence under Section 2(f) to show that a mark has become distinctive by acquiring secondary meaning, we treat it as a concession that the mark is not inherently distinctive. *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994). Since the "Sturgis" mark's registration is still contestable, it may be challenged as invalid on the ground that it lacks secondary meaning. *See* 15 U.S.C. § 1115(a). A mark has secondary meaning when "by long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *Aromatique*, 28 F.3d at 870. If the mark's "primary significance" for consumers is not its identification of its source, it does not have secondary meaning and is thus not protected. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000).

The defendants argue that the jury was not presented with sufficient proof to find that the "Sturgis" mark is distinctive. Although the certificate of registration in the record constituted prima facie evidence of the mark's validity, *see* 15 U.S.C. § 1057(b), it gave SMRI only a rebuttable presumption of validity. *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir. 1984). A registrant is not entitled to the presumption, however, if he alleges that the purported infringer started to infringe a mark registered under Section 2(f) before the mark's date of registration. *Aromatique*, 28 F.3d at 870. The certificate for this mark says that it was registered on February 22, 2011. SMRI, however, alleges that Rushmore has been infringing the mark since at least August 2006 when the Chamber sent Rushmore a cease-and-desist letter. SMRI thus was not entitled to a presumption against Rushmore that the mark is valid. Since the liability of the other defendants under this claim derives entirely from Rushmore's own, SMRI was not entitled to a presumption of validity against any of them, either.

Although the jury was not informed that it could not presume the validity of the "Sturgis" mark if the defendants began to infringe it before its date of registration, the defendants have preserved their argument that SMRI did not present sufficient proof of its validity and could not rely on a presumption of validity to do so. The defendants plainly raised this argument in their motion for judgment as a matter of law. *See* Fed. R. Civ. P. 50(a), (b). The failure to present this issue to the jury does not preclude our review of whether the district court erred in denying the motion. *Estate of Snyder v. Julian*, 789 F.3d 883, 886 (8th Cir. 2015); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 120 (1988). The motion was originally made before the jury received the case on the ground that there was insufficient evidence for it to go to the jury. So despite how the jury was later instructed, we must assess whether the district court correctly held that there was sufficient evidence for the jury to find that SMRI's "Sturgis" mark is valid. After an independent review of the trial record, we conclude that it cannot support that finding.

Since SMRI was not entitled to a presumption of validity, the burden remained on it to prove that the "Sturgis" mark had acquired secondary meaning. *See Cmty. of*

*Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1011 (8th Cir. 2011). SMRI maintains that it did so "by introducing proof that consumers associate the STURGIS® mark with [it] and its predecessors-in-interest." But SMRI did not present any direct evidence of that association like, for instance, consumer testimony and surveys, choosing to rely instead on circumstantial proof alone. *See Frosty Treats, Inc. v. Sony Comput. Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005). SMRI has two basic arguments as to why the "Sturgis" mark is valid: First, the mark identifies it as a distinct source of rally-related goods and services because it and the Chamber, its predecessor-in-interest, have been the mark's continuous and substantially exclusive users in relation to the rally since July 1, 1987; and second, consumers associate the mark with the rally, and the rally is a service that it provides (or alternatively is a service the service-mark rights to which it has acquired) because the Chamber has "hosted" the rally since the 1940s and is today the rally's "sole organizer, promoter and sponsor." The trial evidence supports neither argument, nor any other basis for finding that the word "Sturgis" identifies SMRI as a source of rally-related goods and services. The jury's finding that the mark is valid thus warrants reversal.

In arguing that the evidence supports the jury's finding that the "Sturgis" mark is valid, SMRI points us to voluminous portions of the record with little explanation of why those portions are relevant. SMRI, for example, provides us simply with three lines of citations to the record, after telling us that it "introduc[ed] proof that" the mark has secondary meaning. On the next page of its brief, it tells us that it "presented extensive secondary-meaning evidence" for all its marks, providing us with eight additional lines of citations to the record. SMRI does not tell us which citations are relevant to which mark. The only assistance that SMRI gives as to how those parts of the record are relevant are the nouns that precede each string of citations: *e.g.*, "advertisements," "licensed goods," "product licensees," "advertising on bags," and "royalties." But a litigant may not advert perfunctorily to an argument, hoping that we will do its work for it by developing the argument and putting flesh on its bones.

*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see also United States v. Roberts*, 881 F.3d 1049, 1053 (8th Cir. 2018).

To establish that the word "Sturgis" had acquired secondary meaning, SMRI needed to show, among other things, its "long and exclusive use" of the word "in the sale of [its] goods." *Aromatique*, 28 F.3d at 870. But many of the historical uses of the word that SMRI directs us to cannot reasonably be viewed as uses of the word *as its mark*. SMRI seems to assume, for example, that whenever it or its predecessors-in-interest used the word "Sturgis" to refer to either the rally or the City of Sturgis, they also used it as their mark. But if the word was being used descriptively (*e.g.*, to refer to "Sturgis" the city or "Sturgis" the rally), it was not being used primarily to identify a specific source of rally-related products and services. *See OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 341 (4th Cir. 2009).

For example, Dean Kinney, SMRI's corporate representative, testified at trial about two advertisements for old rally products. He did not seem personally familiar with either ad—saying such things as, "This is also, I think, an advertising page," and "We have what is here is a catalog listing—I think it's an ad, actually"—but he stated nonetheless that both ads used "Sturgis" as a mark. The first ad, from 1989, was for Greg Licht's film "Sturgis 1989: The Video," a documentary of the 1989 Sturgis rally. Kinney asserted that the word "Sturgis" in "Sturgis 1989: The Video" was being used as a mark since it was "at the center of the advertising." He testified similarly that the text on a Classic Silver Co. shirt from 1992, "Black Hills Classic, 1992, Sturgis," also used "Sturgis" as a mark. Kinney did not say why he thought that either use of the word could be attributed to SMRI, but the ad for the movie displayed the Monahan mark and the shirt had the Monahan mark on its opposite side. So the producers of those goods were apparently licensees of the Monahan mark. There was no evidence, however, that they had also licensed the word "Sturgis" from the Chamber. SMRI does not tell us when the Chamber first started to license the word "Sturgis" as its own mark, but Kinney testified that it was not until around the year 2000 that the Chamber began to view the word as the "magic" term behind all its marks. But if the Chamber

-10-

was only "using variations of words in conjunction with Sturgis" until then, we do not see how the jury could reasonably infer from any earlier uses of the word "Sturgis" that consumers had started to associate it with one of the many sources of "Sturgis" goods and services existing at the time.

SMRI's alleged evidence that it used the word "Sturgis" as a mark in the 1980s, 1990s, and even more recently tends to be of this character, coopting each appearance of the word in the ads and on the goods of the Chamber and its licensees. SMRI does not even attempt to explain how these seemingly descriptive uses of the word were actually uses of it as a mark, and we cannot see how that interpretation could be reasonable. If it already is "more difficult to trademark" a rally that features "just the name of the area that hosts it," it is even more difficult to trademark a brand of goods and services based around the rally and the area. *Cf. AuSable River Trading Post, LLC v. Dovetail Sols., Inc.*, 902 F.3d 567, 570 (6th Cir. 2018). We thus conclude that the jury could not possibly infer from those uses of the word "Sturgis"—by which we mean uses that predate the Chamber's licensing of the word by itself as a mark on rally-related goods and services—that the public had started to associate it with a particular source of goods and services.

SMRI also directs us to appearances of the word "Sturgis" in its other marks, including the Monahan and "Sturgis Bike Week" marks. Here, as well, the use of the word on those marks appears to be descriptive, referring to either "Sturgis" the rally or "Sturgis" the city, instead of "Sturgis" the brand of rally-related goods. SMRI again does not explain why consumers would view those uses of the word inside of another mark as a distinct mark that identifies not an association with "Sturgis" the rally or the city, but one of the many sources of goods that are related to the rally and the city. When the word "Sturgis" is simply being used as part of another mark that itself seeks to communicate an association with "Sturgis" the rally and city, the word is clearly not being used as its own distinct mark. We thus conclude that the jury had no basis to infer that consumers interpreted the word "Sturgis" in SMRI's other marks to be a

-11-

mark of its own. *See Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362–63 (11th Cir. 1997).

SMRI also appears to assume that whenever an independent user of the word "Sturgis" on rally-related goods and services becomes its licensee, all of that person's pre-licensed uses of the word are transformed into uses of it as SMRI's mark. So, for example, SMRI directs us to vendor Dean McNenny's eagle-wing patches as evidence that the word "Sturgis" identifies it as a source of rally-related products. The patches depict an eagle holding a banner on its wings that says, for instance, "Sturgis '88" for the 1988 rally. Since the 1980s, McNenny has created a new patch for each rally, and SMRI refers us to a trial exhibit that displays each of his patches from 1986 to 2015. McNenny has long used the word "Sturgis" on his souvenirs: SMRI identifies him as one of the rally's earliest vendors, and he testified that he has used "Sturgis" on his souvenirs since the late 1970s. He also testified that most of the rally souvenirs he has created simply show "the word 'Sturgis' and the date." To be sure, he testified as well that he now buys a license to use the word "Sturgis" on his rally-related souvenirs, but the earliest license for the mark produced during his examination was from 2001.

Unless SMRI believes that McNenny's 2001 license retroactively turned all of his pre-2001 uses of the word "Sturgis" into uses of it as SMRI's mark, SMRI should not have pointed us to McNenny's patches from the 1980s and 1990s in support of its argument that the "Sturgis" mark has acquired secondary meaning. The very fact that McNenny had independently used the word "Sturgis" on his own rally-related goods for decades indicates that consumers had no reason to think that the word's presence on such goods indicated that they all came from a single source. Although McNenny became a licensee of the Monahan mark in 1987, the jury had no basis to infer that since some of McNenny's goods presumably displayed the mark, consumers therefore started to misidentify all of McNenny's goods as the Chamber's or, more relevantly, to misidentify the descriptive term "Sturgis" on his rally-related goods as indicating that the Chamber, instead of him, was their source. We thus conclude that a jury could not simply infer from a current licensee's past, independent uses of the word "Sturgis"

that the relevant class of consumers had started to associate it with a particular source of rally-related goods and services.

McNenny's reasons for buying a license from SMRI to use the word "Sturgis" illustrate why the jury could not infer from SMRI's licensing of the word that it is a valid mark. When asked why he participates in SMRI's licensing program, McNenny said that he first joined it because he "saw a need for a way to help the city with the cost of promoting the rally." The program's profits—SMRI, and the Chamber before it, have advertised—go to support the City of Sturgis. The marketer for Black Hills Rally & Gold, the company that sells McNenny's rally-related goods, agreed that the "value" behind taking a license from SMRI was that "it's easier for us to sell a product and say part of the money does go back to Sturgis so that they all feel good about giving back to the community that does so much for them." "A lot of people come to visit and they realize the stress that [the rally] probably puts on a town, so to be able to say that everything that we sell is licensed, and you are contributing back to the town when you purchase that, I think it adds value," she added. But if McNenny and Black Hills Rally & Gold are licensees of SMRI because they like giving back to their community and selling customers on the idea that their purchases also give back to it, the jury had no basis to infer from their licenses and sales that consumers associate SMRI's marks with a single source of rally-related goods and services.

Jerry Berkowitz, SMRI's primary licensee, echoed these sentiments, testifying that he stopped opposing the Chamber's application to register the word "Sturgis" as a mark when he realized that the Chamber wanted to acquire it to help the rally "move forward in a manner that has subsistence." Berkowitz stated that he was concerned that other motorcycle rallies "had been declining" since they "had no organization" and "the local[s] thought that they didn't [get] respected by the rally itself." SMRI, the record shows, is the entity that the Chamber and Berkowitz helped create to provide the organization and community focus that he felt the rally had been lacking. The record shows that even people intimately involved in the rally can sign onto SMRI's licensing program even though they believe that some of its marks are not valid. For

-13-

example, Jim Burgess, the owner of Sturgis Motorcycle, Inc., and an original SMRI board member, stated that although he opposed the registration of the word "Sturgis" as a mark since the Chamber was not its substantially exclusive user in relation to the rally or rally-related goods and services, he nonetheless supports SMRI's licensing program because "the city of Sturgis and its citizens need to derive some amount of money to hold the rally." SMRI embraces the fact that major players in the Sturgis community, including the City itself, participate in its licensing program as a means of supporting the community. As the City declared in an official resolution that SMRI moved into evidence, it supports SMRI's licensing program since the program helps ensure that the community will "receive the economic benefit generated by" the use of rally-related words like "Sturgis," "Black Hills," and "Sturgis Motorcycle Rally." We conclude that against this backdrop the jury could not infer from the fact that SMRI has successfully licensed its marks that consumers thus view them primarily as identifying a particular brand of rally-related goods and services.

SMRI exaggerates for how long and the degree to which it has used the word "Sturgis" as a mark. The record, moreover, does not support a finding that SMRI has used the word exclusively or substantially so in relation to the rally or rally-related goods and services for any period of time. The first item of evidence that SMRI relies on to support the jury's finding that the "Sturgis" mark is valid is the affidavit that then-Chamber president Marlin Martin sent to the U.S. Patent and Trademark Office as part of the Chamber's application to register the mark federally. In the affidavit, dated November 1, 2001, Martin stated that the Chamber had been the "continuous and substantially exclusive" user of the mark "in connection with the marketing and promotion of the Rally since . . . July 1, 1987." Martin provided some examples of how the Chamber had promoted the rally, and they all involved the marketing and selling "of goods bearing the STURGIS mark," like "caps, hats, [and] T-shirts." But when asked to explain the factual basis of his statement, Martin provided an answer demonstrating that he had purposely and categorically excluded from his assessment relevant third-party uses of the mark. We thus conclude that no reasonable jury could

-14-

have relied on that evidence to infer that SMRI's "Sturgis" mark had acquired secondary meaning in any context.

SMRI and the Chamber, the record makes clear, were only two of the many—perhaps hundreds—of entities that have used the word "Sturgis" to promote the rally and sell rally-related goods and services. In a video deposition that the jury watched, Martin conceded that a number of people and businesses other than the Chamber and its licensees had used the word "Sturgis" on their rally-related goods and services in the 1990s and 2000s. He conceded that the rally was commonly known as "Sturgis" and that the word "Sturgis" thus frequently appeared by itself on, for example, the t-shirts that vendors sold to commemorate the rally. He further conceded that vendors offering their own rally-related goods and services would promote the rally since the more people who attended it, the more customers they might have. But in conceding all of that, Martin made it impossible for any reasonable person to credit his assertion that the Chamber had nonetheless been the substantially exclusive user of the word "Sturgis" to promote the rally, including through the sale of rally-related goods.

The only way that Martin was able to assert that the Chamber had substantially exclusively used the word "Sturgis" for decades to promote the rally was by denying that virtually anyone else promoted it when they independently used the word to sell their own rally-related goods and services. So, for example, in his affidavit he stated that if a licensee of the Chamber sold a t-shirt bearing the word "Sturgis"—say, one that stated "Sturgis 2000" for the 2000 Sturgis rally—the Chamber thereby promoted the rally. But in his video deposition, he added that if an unaffiliated vendor then sold a similar t-shirt saying "Sturgis 2000," the vendor thereby promoted only his shirt and not the rally. Martin testified as well that although the rally consists of many different activities, if the non-Chamber-affiliated group behind one of those activities used the "Sturgis" mark to promote it, the group thereby promoted only its own activity and not the rally itself. Although it was patently unreasonable for Martin to think that only Chamber-approved uses of the mark counted as rally-related uses, it was this logic that enabled him to tell the Trademark Office that the word "Sturgis" had become

-15-

distinctive through the Chamber's substantially exclusive use of it in connection with the marketing and promotion of the rally.

Martin's logic was so incoherent and self-serving that no reasonable jury could accept it. If there were two shirts that said "Sturgis 2000," but only one of them was produced through the Chamber, there were still two rally-related shirts displaying the word "Sturgis." The fact that non-Chamber-affiliated producers were using the word on their rally-related products was directly relevant to whether the Chamber was its substantially exclusive user. Martin, however, ignored those third-party uses since he believed that only the Chamber actually promoted the rally. But he had no right to declare that by fiat. Even if we accepted his assumption that every non-Chamber-affiliated producer of, say, a "Sturgis 2000" t-shirt used the word "Sturgis" to signify and promote only his own rally-related goods, that would still undermine SMRI's case that its mark is valid since it would show that that producer was also using the word *as a mark*, *i.e.*, to identify his line of goods as a distinct brand. But if others were using the word to brand their own rally-related products, Martin was wrong to ignore them. If, by contrast, those unaffiliated producers were using the word "Sturgis" on their goods simply to indicate an association with the rally, then they were not using it as a mark. *See OBX-Stock*, 558 F.3d at 341. And since those unaffiliated uses of the word would suggest that consumers also did not construe it as a mark indicating a brand, Martin was again wrong to ignore them.

It is not clear why Martin believed that only the Chamber's use of "Sturgis" on rally-related goods and services counted as promotions of the rally. It could not have been that the Chamber took on the job of promoting the rally from one of its original supporters: The Jackpine Gypsies are an original supporter and their motorcycle races remain one of the activities comprising the rally, but Martin nonetheless asserted that promoting a rally-related race promoted the race only and not the rally. It also could not have been that the Chamber promoted every rally event, whereas others promoted only their own rally event: Martin admitted that the Chamber did not promote all of the rally's events. It could not have been, either, that no one other than the Chamber

actually promoted the rally: A rally-related t-shirt that says "Sturgis 2000" promotes the rally, regardless of whether the vendor was the Chamber's licensee. Martin, in any event, conceded that some rally vendors would promote not only their businesses, but the rally itself since they stood to benefit when more people attended. Rod Woodruff, for example, testified that he runs the Buffalo Chip Campground in the City of Sturgis and that the Buffalo Chip has for decades used the word "Sturgis" independently of SMRI and its predecessors-in-interest to promote both the rally and the campground's rally-related music festival through, among other things, the *Sturgis Rider* newsletter that it publishes each year. Martin thus had no right to declare that only the Chamber's promotions actually promoted the rally. It is irrelevant to our conclusion here that the jury also found that Martin did not "knowingly" lie in his affidavit: A person can be indisputably, but sincerely, wrong.

Martin was not the only person to testify that the Chamber (and, by extension, SMRI) had been the substantially exclusive user of the word "Sturgis" on rally-related goods and services. But when those other witnesses were asked to explain the factual basis of their assertions, they, like Martin, demonstrated that the assertion could not be credited. So, for example, Jerry Berkowitz, an SMRI board member who also owns Good Sports, Inc., the primary licensee of SMRI's marks, testified that many of the rally's seven hundred vendors have used the word "Sturgis" to sell their goods and to promote the rally and that when those vendors used it they did so to refer to the City of Sturgis (and thus not, by implication, a specific brand of rally-related goods). Since his own company had used the word "Sturgis" continuously since 1985 both to sell rally-related goods and to promote the rally, Berkowitz at first opposed the Chamber's application to register the word federally as its mark. But after years of litigation, he changed his mind, adopting the tendentious logic that Martin had used. He told the jury that he came to believe that although he has "promoted the rally [by] having rally products at the rally," he does not do what the Chamber does: He now distinguishes between the Chamber promoting "the overall rally" and everyone else promoting only their own rally-related products and businesses. But that distinction, we have noted,

-17-

is not a reason to ignore or exclude categorically non-Chamber-affiliated uses of the word "Sturgis" or to deem them non-rally-related.

Dean Kinney, SMRI's corporate representative, similarly testified that only the Chamber and the City use the word "Sturgis" to promote the "overall" rally. He, like Martin and Berkowitz, had excluded from his assessment instances where a vendor unaffiliated with the Chamber and SMRI had used the word on its goods and services; he did so, he stated, because an unaffiliated vendor was trying "to get the people that are coming to the rally to spend a portion or all their time" and money on the vendor's own goods and services, and so the vendor was promoting only his own business and not, Kinney stated further, the rally as a whole. But, as we have explained, SMRI may not dismiss, nor ignore, those unaffiliated uses of the word "Sturgis" on rally-related goods and services. Consumers were still exposed to them, and those independent uses were relevant to whether those consumers associated the word "Sturgis" with a particular source of rally-related products. SMRI and its witnesses were therefore not credible as a matter of law when they told the jury that it and its predecessors-in-interest had been the substantially exclusive users of the word.

We have independently reviewed the record and found no alternative ground to support a finding that the Chamber and SMRI have been the substantially exclusive users of the "Sturgis" word mark in relation to the rally or rally-related products and services. But if a jury could not make that finding, it also had no basis to infer that the mark had "become so associated in the public mind with [the Chamber's and SMRI's] goods that the mark serves to identify the source of the goods and to distinguish them from those of others." *See Aromatique*, 28 F.3d at 870. To be sure, Martin and a few others affiliated with SMRI testified that they believed that the mark was distinctive, but a trademark owner cannot establish that its mark is valid simply by getting its officials and agents to say that it is. Their beliefs, in the end, are irrelevant to whether the mark has secondary meaning in consumers' minds. *Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1332 (8th Cir. 1985). The fact that SMRI and the Chamber have advertised that they use the word "Sturgis" as their mark—on

hangtags and shopping bags, for example—is "relevant . . . in determining whether a mark has acquired a secondary meaning, [but] it is the *effect* of such advertising that is important, not its extent." *Id*. The record, however, does not indicate the effect of that advertising on the degree to which consumers associate the word "Sturgis" with a single source of rally-related goods and services. We conclude that the jury had no basis to find that the word "Sturgis" had secondary meaning based on SMRI's and its predecessors-in-interest's past uses of it.

SMRI also asserts that its "Sturgis" word mark is distinctive because consumers associate it *with the rally*. To contend that a descriptive term has acquired secondary meaning because people associate it with what it describes would seem to be a losing proposition. SMRI does so nonetheless, arguing, for example, that since the "Sturgis" rally became famous in 1990, its mark also became famous at that time. But one does not follow from the other: Everyone could know of the rally as "Sturgis" and find that the City is now synonymous with the rally without also associating the word "Sturgis" with only one of the many sources of rally-related products and services. *See OBX-Stock*, 558 F.3d at 341. SMRI appears to believe that the jury could infer from the fact that the rally is famous that the "Sturgis" mark is also famous (and thus valid) because the Chamber has, SMRI contends, "hosted" the rally since the 1940s and is today the rally's "sole organizer, promoter and sponsor." Even if the record showed—which it does not—that SMRI has a valid service mark for the word "Sturgis" in relation to the organizing and conducting of the rally, SMRI would still need to establish what it has not—that the word operates as its mark in other contexts. Owners of a mark "have no right in gross." *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 777 (8th Cir. 1994). The record, in any event, does not support a finding that the Chamber has historically hosted the rally or is presently *the* organizer, promoter, and sponsor of the rally. So the record still does not support the jury's finding of validity.

SMRI maintains that the Chamber has hosted the rally since the 1940s, but it bases that assertion on the testimony of two people who stated that the Chamber used to host a picnic during the rally. One witness stated that he once saw a picnic that the

Chamber "may have" hosted: He assumed that the Chamber was involved because he observed "business people from all over town" there. The other witness provided a bit more detail about the picnics, saying that before the rally grew big the Chamber hosted a picnic for "a few years." That testimony can hardly support the contention that the Chamber has hosted the rally itself for seventy-odd years.

SMRI asserts that the Chamber has also been "the sole organizer, promoter and sponsor of the rally" since 1985. To support that assertion, SMRI directs us only to the testimony of Jack Hoel, son of the rally's founder, that in 1985 the Chamber "had no money and weren't equipped to know what" to do with the many requests it was receiving for information about the rally, and so it "hired" Neil Hultman to respond to the requests. The jury heard from only one other witness about how the Chamber had used Hultman. John Johnson, the banker who helped arrange the financing that led to the creation of SMRI, testified that in the 1980s "the chamber of commerce, which was two people at the time, basically an executive director and secretary, [was] overwhelmed with phone calls and information requests about the rally." Johnson told the jury that the Chamber had hired Hultman "to field the questions and . . . cover the information that was needed." Although the rally was "an unorganized event where motorcyclist[s] showed up in Sturgis the first week in August and had a good time," Hultman was a member of the Jackpine Gypsies, which hosted "the majority of the [rally's] organized events." He was thus in a position, presumably, to tell prospective rallygoers about what to expect if they attended.

Other witnesses testified in a conclusory manner that around 1985 the Chamber took over the rally's promotions, but the only details in the trial transcript about what that testimony could have meant is that the Chamber had hired Hultman to answer the rally-related questions that the Chamber received. Some of those witnesses, like Dean Kinney, stated that "a loose knit group of businessmen" that had formed in the 1970s to support the rally, the Black Hills Motorcycle Classic Group, became part of the Chamber around 1985. But it appears that the Chamber's acquisition of that group did not augment its rally-related responsibilities by much. Kinney, for example, said that

the post-acquisition Chamber "handle[d] the day-to-day promotion of the rally and deal[t] with the phone calls and the many tourists' interests and work[ed] with the city on what day to block off the streets, and all those kinds of things." But those acts were already part of the Chamber's "job," as Kinney put it, "to promote economic development and business in the Sturgis area."

Even if we assumed that in the mid-1980s the Chamber became a clearinghouse of promotional information and materials about the rally, the jury, as we have held, had no basis to find that it was the only entity promoting the rally. Even if it had been the only one, the record can only be read as indicating that the Chamber was simply promoting an event that others—many others—were putting on. The record does not suggest that the Chamber or SMRI ever displaced those other people and groups. The witnesses, when asked, uniformly denied that any single entity owns or produces the rally; their testimony univocally indicated that, as Berkowitz said, the rally has always been made up of the different events that different groups put on. Coordinating with the City on when streets should be blocked off to traffic and how the City could best accommodate (and pay for) the sudden influx of rallygoers into the area does not, moreover, convert the Chamber into *the* organizer and sponsor of the rally. If the owners of the buildings on Sturgis's Main Street decided to set up attractive window displays each Christmas, but did not promote them or work with the City on how best to manage the foot traffic they caused, the Chamber would not usurp the owners to become *the* organizer and sponsor of the displays if it decided to do those things on its own initiative or even if the owners asked it to do those things for them.

SMRI also suggests that its "Sturgis" mark is valid because the City of Sturgis undertakes "the extensive planning required . . . to prepare for the Rally." SMRI does not explain why the City's governmental actions should be attributed to it, and we do not see the connection. It is true that the City spends a tremendous amount of money providing the infrastructure that accommodating hundreds of thousands of people into a town of only a few thousand entails: Daniel Ainslie, the City Manager, testified that the "direct cost" to the City of "an average rally is right around a million dollars." To

help cover those costs, the City sublicenses SMRI's marks to third parties as part of a sponsorship program, and it has an "exclusive license" from SMRI to use the marks "for the purpose of promoting" the rally, including through the solicitation of those sponsorships. But the fact that the City uses SMRI's marks to raise money from third parties did not provide the jury with any basis to find that the City operates as SMRI's agent when it provides municipal services during the rally. SMRI cannot adopt as its own the rally-related conduct that its licensees engage in on the ground that they have licensed some rally-related marks from it.

Insofar as SMRI might contend that its rights over the rally descend from the City itself, the record does not indicate that the City's involvement in the rally extends beyond the heroic provision of municipal services. The Supreme Court of South Dakota has noted that "[a] city can do much to support an event which draws people and dollars to the area," but providing "inherent municipal functions," including "law enforcement and maintenance of public areas," and "cooperat[ing] to insure the event was an overall success" does not make the city "an official sponsor" of the event. *In re Appeal of Jackpine Gypsies Motorcycle Club, Inc.*, 395 N.W.2d 593, 595 (S.D. 1986). We agree and hold that the jury could not infer from the onerous planning that the City undertakes to provide infrastructure for the rally that the City was *the* organizer or sponsor of the rally. To allow such an inference would be tantamount to saying that it would be reasonable to infer that the City of New York organizes the sessions of the United Nations General Assembly because of everything it does to assist their occurrence. One cannot infer from the fact that a city augments its municipal services to accommodate those who attend an event—*e.g.*, a funeral or political protest—that it organizes, promotes, or sponsors the event in a way that would permit it to acquire ownership over the event or its intellectual property.

The parties elicited very little information at trial about how the rally itself, by which we mean the events that rallygoers attend, is currently organized. That is probably because, as SMRI's Treasurer testified, no particular entity actually produces it. In any event, the record does not support a finding that SMRI owns, produces, or

-22-

operates the rally, or does anything else that might allow it to acquire ownership over the rally itself or its intellectual property. The record indicates to the contrary that the rally is a pluralistic endeavor. Kinney, SMRI's corporate representative, testified that the rally is "a lot of things, a lot of places, a lot of private events." Berkowitz, the owner of SMRI's main licensee, agreed that the rally consists of events put on by many different groups. And Woodruff, the owner of the Buffalo Chip campground, testified that he hosts about fifty bands each rally and that he produces his music festival independently. The jury could not reasonably conclude from this record that SMRI or its predecessors-in-interest were or are the owner, organizer, or sponsor of the rally or have come to acquire the rally's intellectual property rights.

In sum, the jury's finding that the "Sturgis" word mark is valid cannot stand: The trial record does not support that SMRI owns the rally or its intellectual property, that SMRI and the Chamber before it have been the substantially exclusive users of the word "Sturgis" in relation to either the rally or rally-related goods and services, or that relevant consumers associate the word "Sturgis" with a single source of goods and services in any context.

Two things follow as a consequence of our conclusion that the record does not support the jury's finding that SMRI's "Sturgis" word mark is valid. First, we must reverse the jury's finding that the defendants diluted the "Sturgis" mark. *See* 15 U.S.C. § 1125(c). Second, we must vacate the jury's finding that the defendants engaged in cybersquatting. *See id*. § 1125(d). The district court submitted SMRI's cybersquatting claim to the jury based in part on the theory that the "Sturgis" mark is valid. Since that theory was not submissible and we cannot tell whether the jury based its finding on the theory "in whole or in part," we must vacate the cybersquatting verdict. *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494, 502 (8th Cir. 2010).

B

Although two of SMRI's trademarks are unregistered, they are still entitled to protection if they serve to identify "a particular source of a product." *See Two Pesos,*

-23-

*Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Since the parties agree that those marks are not inherently distinctive, they are protected only if they have "acquired distinctiveness through secondary meaning." *Id.* at 769. The defendants maintain that they should have been granted judgment as a matter of law on the infringement claims relating to SMRI's unregistered marks, "Sturgis Motorcycle Rally" and "Sturgis Rally & Races," because the jury was not presented with sufficient evidence to find that the marks had acquired secondary meaning. We agree.

It was SMRI's responsibility to prove to the jury that its unregistered marks had acquired distinctiveness by the time of the defendants' challenged conduct. *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 449 (8th Cir. 2018). SMRI again presented only circumstantial evidence of secondary meaning, and after a careful examination of the record we hold that that evidence did not provide a legally sufficient basis for the jury to find that the unregistered marks had acquired distinctiveness. The same difficulties that led us to hold that the record does not support a finding that the "Sturgis" word mark is valid occur here as well.

In contending that its marks have secondary meaning, SMRI's main brief barely mentions its unregistered marks. The only thing it says about them is that some of its witnesses "testified about the longstanding use and distinctiveness of the STURGIS RALLY & RACES and STURGIS MOTORCYCLE RALLY marks to connote SMRI and its licensees and their respective goods and services." But the parts of the record that SMRI cites in support of that statement do not support it: One witness merely said that in the 1970s some people called *the rally* the Black Hills Motorcycle Classic and that people later called it the Sturgis Rally and Races. The fact that those names were popular names for the rally indicates, to the contrary, that they do not identify one of the many sources of rally-related goods and services. A second witness talked only about SMRI's licensing program without ever mentioning its unregistered marks. The final witness that SMRI identifies talked about the marks, but all he said is that SMRI and the Chamber have used them in their licensing programs. In the part of the record cited to us, however, the witness did not bring up the extent, nature, or effect of those

-24-

uses of the marks. If the witness provided those details in another part of his testimony, it was SMRI's responsibility to direct us to them, *see Brown v. City of Jacksonville*, 711 F.3d 883, 888 n.5 (8th Cir. 2013), and our independent review of the transcript has not revealed those details, either. We thus conclude that the jury had no basis to find that the trial testimony demonstrated that the unregistered marks had acquired secondary meaning.

As we observed, in arguing that the record supported the jury's findings that its marks are valid, SMRI rarely discusses each finding separately even though the jury made specific findings about each mark. Evidence indicating that one of the marks had acquired secondary meaning does not necessarily show that any other mark had acquired it as well. SMRI nonetheless directs us primarily to evidence pertaining to its "STURGIS Marks," eliding the fact that five different marks and as many jury findings are actually at issue here. A party should not leave for us the task of divining how its undifferentiated argument can be recast as the several specific arguments that it should have made instead. By doing so, the party risks having us declare that it has forfeited its argument. *See id.* We have nonetheless reviewed the parts of the record that SMRI says contains "extensive secondary-meaning evidence" for all of its marks to see whether they support the jury's findings about the unregistered marks.

SMRI points us to several pages of advertising in the record, but the ads rarely use the words in the unregistered marks *as a mark*. They instead use "Sturgis Motorcycle Rally" mostly to refer to the rally itself and only use "Rally & Races" as part of the Monahan mark, the federal registration for which disclaims the exclusive right to use "Motor Classic" or "Rally & Races." *See* Registration No. 1,948,097. SMRI also directs us to photographs of its licensed products. But most of those products do not display the words "Sturgis Motorcycle Rally" or "Sturgis Rally & Races" as a standalone mark, using them instead—insofar as they use them—as part of a more elaborate name, such as SMRI's full corporate name, or mark. *See, e.g.*, "75th Sturgis Motorcycle Rally 1938 2015," Registration No. 4,871,446 (disclaiming the exclusive right to use "Motorcycle Rally"). Aside from the appearance of "Rally

& Races" as part of a longer phrase in the Monahan mark, the only item displaying "Sturgis Rally and Races" is a shirt for, it appears, the 2005 rally. The fact that SMRI has used the words in the unlicensed marks, which the record indicates are popular names for the rally, as part of a more elaborate name or mark does not demonstrate that consumers have come to associate them primarily with a single source of goods and services. *See Lone Star Steakhouse & Saloon*, 106 F.3d at 362–63. SMRI does not explain why it would have been reasonable for the jury to infer that association from those uses, forfeiting the point. We do not believe, in any event, that the jury could reasonably infer that consumers had latched onto those words and now associate them primarily with a specific source of rally-related goods and services.

Although some of SMRI's products use the words "Sturgis Motorcycle Rally" and "Sturgis Rally & Races" on their own, instead of as part of a more elaborate name or mark, SMRI did not present the jury with any direct proof of how consumers view those words. So the issue is whether the jury could reasonably infer that the primary significance of the words is as a source identifier. SMRI's fundamental difficulty here is that these unregistered word marks, like some of its registered marks, are common names for the rally itself. SMRI, for example, calls the rally the "Sturgis Motorcycle Rally" throughout its briefs, and it admits that the rally has been "known historically" as the "Sturgis Rally & Races." But if the public already associates those names with *the rally*, the jury could not infer that whenever SMRI or the Chamber intended to use them *as a mark* (*i.e.*, to identify SMRI or the Chamber as a source of rally-related goods and services), consumers actually interpreted them in that manner. Even when SMRI and the Chamber included trademark symbols within those names, the jury had no reason to infer that consumers interpreted the purported trademark as identifying a source of rally-related products and services, instead of the rally itself. Insofar as SMRI argues that the distinction between it, as a source of rally-related goods and services, and the rally itself is insignificant, we reiterate that the distinction is crucial: If consumers view SMRI's marks simply as indicating "an association with" the rally, then they are not viewing them as identifying a specific "brand" of rally-related things and thus are not viewing them as a mark. *See OBX-Stock*, 558 F.3d at 341.

-26-

SMRI contends that its licensing of the unregistered marks also shows that they have acquired distinctiveness. But of the nine licensing agreements that it points us to, only three involved the unregistered marks, and the marks were licensed only as part of a package deal that included all of the Chamber's marks. We have noted that SMRI's evidence that its licensees generally participate in its licensing program since they want to support the City precluded the jury from inferring that SMRI's licenses show that its marks are valid. But even if that inference applied here, the agreements involving SMRI's unregistered marks do not demonstrate that anyone other than the Chamber itself, as licensor, found them distinctive. In one agreement, the Chamber provided all of its marks to Good Sports, Inc., as part of the deal making the company its primary licensee. In another agreement, the Chamber granted the City an exclusive right to use its marks to promote the rally. In the final agreement, the City granted the local Coca-Cola bottling company a sublicense to use the Chamber's marks in return for large amounts of Coca-Cola products, among other things. Since those licenses all involved global transfers of the Chamber's marks, the jury could not use them to infer that two of the marks included in those packages had secondary meaning. Such an inference would rest on speculation. At best, the licenses suggest that the Chamber found the unregistered marks valid or at least wanted them to be, but the beliefs and intent of the marks' owner are irrelevant. *Co-Rect Prods.*, 780 F.2d at 1332.

The clearest uses of "Sturgis Motorcycle Rally" and "Sturgis Rally & Races" *as marks* are the hangtags that SMRI, and the Chamber before it, attached to some of their products. The tags declared that SMRI owns several marks, including "Sturgis Motorcycle Rally," or that the Chamber owned some, too, including "Sturgis Rally & Races." At some point, the Chamber also distributed shopping bags to vendors that told consumers to "Look for the Tag!" and buy officially licensed rally products. But SMRI does not provide us with much information about its hangtag campaign beyond the fact that it had one. A full-page ad for the campaign in the 2005 *Official City of Sturgis Motorcycle Rally Magazine* stated, "Browse through enough t-shirts, baseball caps and bandannas during the rally and you'll discover that there are dozens of different labels and logos for the event." The ad made clear that only those labels and

-27-

logos carrying the Chamber's hangtag were part of "the official licensing program." Here, at least, consumers were presented with something that indicated when "Sturgis Motorcycle Rally" and "Sturgis Rally & Races" were being used as a mark for rally-related goods and services. The record, however, does not indicate the effect that this advertising had on consumer associations. The record in fact does not reveal whether any of SMRI's and the Chamber's efforts to make the unlicensed marks distinctive were successful. Nor does it support an inference that SMRI's and the Chamber's uses of those marks caused consumers to equate them—two common names for the rally itself—primarily with a source of rally-related goods and services. So the jury was not presented with sufficient proof to conclude that SMRI's unlicensed marks, "Sturgis Motorcycle Rally" and "Sturgis Rally & Races," are valid and protected.

C

Next, SMRI holds six federal registrations for its "Sturgis Bike Week" word mark, and certificates of registration for each of them were admitted into evidence. Some of the registrations were still contestable and thus subject to challenge for lack of secondary meaning. *See* 15 U.S.C. § 1115(a). Since none of those registrations was entered in the Principal Register under Section 2(f) of the Lanham Act, SMRI is entitled to a presumption that the mark is valid even if the alleged infringement began before the mark's date of registration. *See Aromatique*, 28 F.3d at 869–70.

The defendants contest the jury's finding that the "Sturgis Bike Week" mark is valid, asserting that there was "no evidence" to support it. But that is not right: The certificates of registration in the record constituted prima facie evidence of the mark's validity. *See WSM*, 724 F.2d at 1326. We do not deny that evidence of a trademark's invalidity could be so overwhelming that no reasonable jury could refuse to accept it as rebutting a presumption that the mark is valid. The defendants, however, do not contend that that is the case here. The only proof of invalidity that the defendants cite is the testimony of three lay witnesses that "Sturgis Bike Week" is another common name for the rally. That is not overwhelming evidence, especially since the evidence supports a finding that Virginia Rhodes, who first registered the mark federally, has

been using it on rally-related t-shirts for decades, that it has long identified her as the source of those t-shirts, and that she ultimately assigned the mark and its goodwill to SMRI. Even if, as the defendants argue, some of the testimony indicating the mark's invalidity represented party admissions by SMRI, their status as admissions would simply mean that they were not hearsay, *see* Fed. R. Evid. 801(d)(2), and not that the jury was required to credit them. *See United States v. Kroh*, 915 F.2d 326, 334 (8th Cir. 1990) (en banc). Although there was no direct evidence that consumers consider the mark distinctive, the jury was entitled to find that the presumption of validity that the certificates of registration created had not been rebutted.

The defendants also contend that the jury should have found that the "Sturgis Bike Week" mark is generic. *See* 15 U.S.C. § 1065(4). But the defendants had the burden to prove it, *see ZW USA*, 889 F.3d at 449, and the jury was generally entitled to reject their proof. *See Weitz Co. v. MacKenzie House, LLC*, 665 F.3d 970, 977 (8th Cir. 2012). We do not dispute that the evidence of a mark's genericness could be so overpowering that no reasonable jury could refuse to accept it. But the defendants rely on the same testimony here that we already held was not so overwhelming that any reasonable jury would have accepted it. Their argument, moreover, appears to be predicated on a confusion about the meaning of genericness. If "Sturgis Bike Week" is simply yet another common name for the rally, then the use of those words on a shirt might describe what the shirt is referring to or commemorating, but it would not turn the words into the name of "the genus of which the [shirt] is a species." *See ZW USA*, 889 F.3d at 448. As SMRI has correctly observed, if a consumer were presented with a shirt, a cap, and a pin that all said, "Sturgis Bike Week," there is no reason to believe that he would say that they are all examples of something known as a Sturgis Bike Week. But if there is no evidence that consumers understand those things to be members of the genus "Sturgis Bike Week," then there is no evidence that the words "Sturgis Bike Week" are generic.

Since the defendants do not dispute that the jury was presented with sufficient evidence to find that they had infringed the "Sturgis Bike Week" mark, if it is valid,

we have no occasion to pass judgment on that matter. We hold only that the evidence at trial supported the jury's finding that the mark is valid.

D

The defendants do not challenge the validity of the Monahan composite mark —only whether the jury had sufficient evidence to conclude that they both infringed it willfully and intentionally and also counterfeited it. Since the jury did not specify which of Rushmore's products infringed this mark, we must first determine what a reasonable jury could have found infringing. SMRI suggests that whenever Rushmore used the words "Sturgis," "Sturgis Rally," or "Sturgis Motor Classic" on a product, the jury could have found that it infringed the Monahan mark. But that is certainly not right. The Monahan mark is a composite mark displaying a specific, detailed design and almost a dozen words. It has long been the law that "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545–46 (1920). So "rather than consider the similarities between the component parts of the marks, we must evaluate the impression that each mark in its entirety is likely to have on a purchaser." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010). The fact that the dominant aspect of the Monahan mark and the "Sturgis," "Sturgis Rally," and "Sturgis Motor Classic" marks might be the word "Sturgis" does not mean that they are all similar. *See id.* That is especially true where, as here, the word "Sturgis" in the Monahan mark is descriptive of what the mark commemorates—the rally held each August in Sturgis, South Dakota—and thus represents a "weak" element of the mark. *See Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096, 1099 (8th Cir. 1996). Also, the federal registration for the Monahan mark disclaims the exclusive right to use the words "Motorcycle Classic" and "Rally & Races." *See* Registration No. 1,948,097. The jury thus had no basis to conclude in the absence of direct proof that the defendants' uses of "Sturgis," "Sturgis Rally," or "Sturgis Motor Classic" infringed the Monahan mark.

SMRI brings to our attention only one other product from the defendants in its argument supporting the jury's finding that the Monahan mark was infringed: The shot glass entered in evidence as Trial Exhibit 237-A. The glass displays a trapezoidal design with a narrower base. Written across its top are the words "Genuine Article-Accept No Substitutes," under which are written the words "Quality" on the far left and then "Brand" on the far right. In the middle of the design is a broad horseshoe on which "Sturgis Motor Classic™" is written in an arc. Within the horseshoe is a bird of prey facing right in three-quarter view in front of a billowing U.S. flag on which ten stars can be seen. Under the bird and the flag, right between the horseshoe's heels, is a motorcycle. A feather-shaped leaf rises next to each heel. Under the motorcycle "1938" is written, and below that, in the middle of the bottom of the design, are the words "South Dakota." On the design's bottom left, it says "Founder 'Pappy' Hoel," and on its bottom right, "Oldest & The Biggest." SMRI maintains that the design also includes "livestock, and perhaps buffalo," but it does not. Kinney, SMRI's corporate representative, testified that the glass's design was "similar in nature" to the Monahan mark. Other than this testimony and some general background on the Monahan mark's history and uses, the jury primarily had the glass and the mark, as seen in its federal certificate of registration and on various licensed products, before it when it evaluated whether the glass's design infringed the mark.

 

(On the left, Rushmore's shot glass; and on the right, SMRI's Monahan mark.)

We have stated that a fact-finder may visually compare two marks along with their manners of use to determine whether consumers would likely confuse one mark with the other. *Heartland Bank v. Heartland Home Fin., Inc.*, 335 F.3d 810, 821–22 (8th Cir. 2003) (Smith, J., joined by Hansen, J., concurring). The fact-finder still must apply the standard that we use to evaluate a likelihood of confusion, *Insty\*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 670 (8th Cir. 1996), but there is no reason to foreclose the possibility that in some actions a mark's owner may rely on a visual inspection, without any corroboration from consumer surveys or examples of actual confusion, to prove there is a likelihood of confusion. If, for example, the purportedly infringing mark appears confusing or deceptive on its face, and relevant consumers do not bring to their purchasing decisions atypical or specialized knowledge, a visual inspection might represent a bare-bones way of proving likely confusion. Otherwise, it would appear beyond the ken of a jury to deduce from a visual examination that has not been informed by direct evidence of consumer associations that a challenged use would likely confuse or deceive the ordinary, prudent consumer. *Cf. Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 504–05 (8th Cir. 1987).

1

The jury found not only that the defendants infringed the Monahan composite mark, but that they did so willfully and intentionally. The district court instructed the jury on the definition of "willfully" only in relation to SMRI's request to recover the defendants' profits under 15 U.S.C. § 1117(a), *cf. Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 191 (1st Cir. 2012), stating that a defendant acts "willfully" when it acts "with the conscious intent to benefit from the goodwill or reputation of SMRI's trademark." We have not identified the type of intent that constitutes the willfulness sufficient to support a disgorgement award of profits, and we do not do so today since the parties do not challenge how the jury was instructed on this point. We observe, however, that the standard of willfulness contained in the court's instruction is simply one of the many definitions that courts have used. *See W. Diversified Servs., Inc. v Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1273–74 (10th Cir. 2005). If the jury was

presented with sufficient evidence to find that the infringement was willful under that standard, it could necessarily also find that the infringement was intentional.

We hold that the trial evidence supports the jury's finding that the defendants' infringement of the Monahan composite mark was willful and intentional. The record supports the findings that the Monahan mark has been widely used in connection with the rally since the mid-1980s and that some consider it, whether rightly or wrongly, the "official" logo of the rally (as opposed to the Chamber's and now SMRI's efforts in support of the rally). The record shows, moreover, that Rushmore knew about the mark and its frequent use on rally-related products, as evidenced by its 1999 license to use the mark for a year on postcards. The many similarities between the dominant design on the shot glass and the longstanding Monahan mark also provided the jury with a reason to conclude that Rushmore had consciously intended its glass to benefit from the goodwill that consumers may associate with the Chamber's and now SMRI's civic-minded mission statements: The mark and the dominant design on the glass share a circular shape; a geographic term ("Sturgis," "Black Hills") followed by the phrase "Motor Classic," both names for the rally, are boldly written in an arc across the top; underneath those words, a bird of prey's head, facing right, emerges into each circle from the left; above and to the right of each bird's head are ten stars; under each bird and stars is a motorcycle; and near each circle's lower half are feather-shaped designs. The glass also states, "Genuine Article-Accept No Substitutes," from which the jury could infer that Rushmore consciously intended consumers to confuse the dominant design on the glass with the closely similar "official" Monahan mark.

2

The jury found further that the defendants had produced "a counterfeit" of the Monahan mark. The Lanham Act defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. A counterfeit is thus far more similar to the registered mark than a mark that barely infringes it, and so an infringing mark is not necessarily also a counterfeit. *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:15.50

-33-

(5th ed. 2018); *see also Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 527–28 (2d Cir. 1983). The Rushmore shot glass is again the only item infringing the Monahan mark that SMRI has brought to our attention, and our independent review of the record has not identified another candidate. Nothing on the glass, however, could be reasonably viewed as substantially indistinguishable from the Monahan mark. For example, the words crowning the glass's dominant design are "Sturgis Motor Classic," while those on the mark are "Black Hills Motor Classic" in an obviously different font. The bird on the glass is an eagle shown in three-quarter view, whereas the bird on the mark is difficult to identify and shown in profile. There is a U.S. flag behind the bird on the glass, but none on the mark. The motorcycle on the glass is riderless; the two on the mark have riders. The glass has "1938" near the bottom of its circular design, and it does not depict a buffalo or other mammal. The mark, by contrast, depicts six buffalo near the bottom of its circular design, and it does not display a date. We conclude that the differences between the glass's design and the Monahan mark are so obvious that the jury did not have any basis in the record for its finding of a counterfeit. *See Kelly-Brown v. Winfrey*, 717 F.3d 295, 314–15 (2d Cir. 2013).

## III

In addition to finding that the defendants had infringed five of SMRI's marks, the jury found that they also engaged in deceptive trade practices, false advertising, and unfair competition. The defendants say that the district court should have granted their motion for judgment as a matter of law as to these claims, too. We review the district court's decision *de novo*. *Holmes*, 895 F.3d at 1001.

SMRI claimed that the defendants had committed deceptive trade practices in violation of South Dakota law. The relevant statute makes it unlawful for a person "[k]nowingly [to] act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise." *See* S.D. Codified Laws § 37-24-6(1); *see also Sisney v. Best Inc.*, 754 N.W.2d 804, 811

(S.D. 2008). The jury found that all of the defendants, except JRE, had engaged in deceptive trade practices, awarding SMRI $107,500 in damages.

SMRI's claim had a statute of limitations of "four years after the occurrence or discovery of the conduct which is the subject of the action." S.D. Codified Laws § 37-24-33. The district court thus informed the jury that it "may only consider defendants' conduct occurring on or after June 22, 2007," which was exactly four years to the day before SMRI filed the claim in this action. The defendants argue that the district court should have held the entire claim time-barred since the Chamber first discovered their deceptive trade practices in 2006, more than four years before SMRI filed this action. But that is not what the statute provides. The statute does not say that a plaintiff may not sue a defendant for deceptive conduct if four years have elapsed since the plaintiff first discovered that the defendant engages in such acts. The statute instead limits the plaintiff's action to those deceptive acts and practices that either occurred or were discovered at least four years before the action was brought. So by limiting SMRI's claim to only those acts and practices that occurred in the four years leading up to this case, the district court actually took a conservative approach: It is possible that SMRI first discovered within the limitations period that the defendants had engaged in some deceptive conduct that had occurred outside of it. We conclude that the district court did not err in holding that SMRI's entire claim was not time-barred.

Under South Dakota law, SMRI may recover only the "actual damages" that it suffered "as a result of" the defendants' deceptive acts and practices. S.D. Codified Laws § 37-24-31. SMRI thus had to establish that it suffered "damages proximately caused by [their] deceptive practices in connection with the sale or advertisement of merchandise." *Sisney*, 754 N.W.2d at 811. The defendants maintain that SMRI did not prove any actual damages. The record, however, clearly supports a finding that SMRI suffered actual damages due to the deceptive conduct that the defendants engaged in on and after June 22, 2007. Brian Niemann, one of Rushmore's co-owners, testified that from around 2006 to 2011 Rushmore advertised that its rally-related goods were "Officially Licensed Sturgis," and there is evidence that Rushmore placed that slogan

on its products' hangtags alongside the phrase, "Look For The Tag!," which mimicked an ad campaign that the Chamber had used to promote its own "officially licensed" rally products. At trial, Paul Niemann, also Rushmore's co-owner, admitted that it was "meaningless" for Rushmore to call its goods "officially licensed" because they were neither official nor licensed. He further admitted that no one other than SMRI and Rushmore had designated its rally-related products as officially licensed. There was, moreover, proof that Rushmore's deceptive advertising had misled at least one person: In 2011, near the end of Rushmore's "Officially Licensed Sturgis" campaign, the manager of the apparel department at a local Wal-Mart called SMRI's licensing agent to ask whether Rushmore's products were actually "official Sturgis Motorcycle Rally products." The first year that the record shows Wal-Mart carrying any of Rushmore's products was 2011. And if the management at Wal-Mart was deceived into thinking that Rushmore's "Officially Licensed" products were SMRI's products, the jury could infer that SMRI thereby lost sales to Rushmore on the ground that Wal-Mart had purchased Rushmore's products in 2011, having been misled into thinking that they were SMRI's. The record indicates that even after Wal-Mart's confusion was cleared up, Wal-Mart continued to retail the very items that had initially misled it into thinking that Rushmore's rally-related products were SMRI's. We conclude that there was sufficient proof in the record from which a jury could find that actual damages existed. *See In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 674 (S.D. 2003).

The defendants also assert that "[t]he invalidity of the underlying marks defeats this [deceptive trade practices] claim." But we have rejected the defendants' argument that SMRI's "Sturgis Bike Week" mark is invalid since it is generic, and so the jury's finding of validity stands undisturbed. The defendants, moreover, did not contest the validity of SMRI's Monahan mark. Since they do not develop their argument beyond that single sentence, we hold that they have forfeited it. *Roberts*, 881 F.3d at 1053. We also reject their argument that the jury's verdict as to SMRI's false-advertising and unfair-competition claims must be reversed once we have held, for example, that SMRI did not prove that its "Sturgis" mark is valid. The district court did not submit

either of those claims to the jury on the theory that any of SMRI's marks was valid. The defendants do not otherwise challenge the jury's verdict as to those claims.

## IV

SMRI challenges only one aspect of the district court's order on the defendants' motion for judgment as a matter of law: It contends that the district court abused its discretion by considering JRE's defense that it was not subject to suit. *Trip Mate, Inc. v. Stonebridge Cas. Ins. Co.*, 768 F.3d 779, 784 (8th Cir. 2014). Under South Dakota law, a party may not enforce any claims against a dissolved domestic corporation that lacks undistributed assets. S.D. Codified Laws § 47-1A-1407.2(1). SMRI argues that because JRE did not raise this defense in its pleadings, *see* Fed. R. Civ. P. 9(a)(2), and the district court did not announce that its pleadings had been amended, JRE's defense remained unpleaded. But it does not matter that JRE did not raise the defense in its written pleadings if the parties consented to trying it, *see* Fed. R. Civ. P. 15(b)(2), and whether the district court announced that they had amended the pleadings by consent is irrelevant if SMRI had "actual notice" of the defense and "an adequate opportunity to cure any surprise resulting from" it. *See Trip Mate*, 768 F.3d at 784.

The defendants note that SMRI has known since at least 2012 that JRE is a defunct South Dakota corporation without assets: In the statement of material facts accompanying its summary-judgment motion in 2012, SMRI specifically noted that JRE had been dissolved since 2010, and in their response the defendants asserted that JRE no longer had any assets. But that is not exactly the issue. The issue is whether SMRI had actual notice that JRE was going to use those assertions as a legal defense. JRE does not direct us to any proof that it alerted SMRI to its defense before trial. But we have held that it may nonetheless be implied that a party consented to the trying of a defense "if evidence to support [it] was introduced at trial without objection." *Clark v. Martínez*, 295 F.3d 809, 815 (8th Cir. 2002). At trial, the defendants, without objection, elicited testimony from Paul and Brian Niemann about JRE's dissolution as a corporate entity and the distribution of all of its assets to Rushmore to settle an outstanding debt. The single item of evidence that SMRI contends it had "no notice"

-37-

of—a corporate resolution purporting to memorialize JRE's dissolution and the sale of its assets to Rushmore for $35,830.03 to offset a debt that it owed Paul and Carol Niemann—was admitted into evidence by stipulation. That evidence and the related testimony was not relevant to any of the issues already pleaded. When JRE initially moved the district court for judgment as a matter of law on the basis of JRE's defense, *see* Fed. R. Civ. P. 50(a)(2), SMRI did not object that it lacked notice of the defense or had been taken by surprise. We thus hold that the district court properly considered JRE's defense since SMRI had consented to trying it.

SMRI argues that the district court later erred in granting judgment to JRE since the jury was not instructed on the defense. But, as we explained, the failure to present an issue to the jury does not preclude our review of whether the district court should have granted judgment as a matter of law on the issue. *Estate of Snyder*, 789 F.3d at 886. SMRI's only other argument against the district court's decision is that since JRE sold its assets to Rushmore to pay its debt to Paul and Carol Niemann, SMRI should have been allowed to recoup the assets' sales price, presumably from Paul and Carol Niemann, to satisfy the judgment against JRE. The relevant statute, however, permits the enforcement of a claim against only a defunct corporation's "undistributed assets," *see* S.D. Codified Laws § 47-1A-1407.2(1), and SMRI does not contend that JRE's assets were not actually distributed. We thus conclude that the district court did not err in granting judgment as a matter of law to JRE.

V

After the jury rendered its verdict, the district court entertained the equitable defenses that the defendants had raised in their answers to the amended complaint, ruling that SMRI was estopped by laches and by its acquiescence from recovering damages from the defendants. SMRI argues that the district court should not have ruled on the equitable defenses since SMRI had a Seventh Amendment right to have a jury decide them and, SMRI argues further, the defendants forfeited their defenses when they did not submit them to the jury. That argument is wrong. In making it, SMRI misstates our precedent. In *Masters v. UHS of Delaware, Inc.*, 631 F.3d 464,

-38-

469 (8th Cir. 2011), we held that the equitable defenses in that case had "presented fact-bound inquiries that were properly submitted to the jury." SMRI's counsel cites this precedent, but avers that it held that equitable defenses "'present[ing] fact bound-inquiries' are to be submitted to the jury." This is not correct. The "determination of equitable defenses . . . is a matter for the court to decide, not the jury." *Smith v. World Ins. Co.*, 38 F.3d 1456, 1462 (8th Cir. 1994). The district court properly tried the legal claims to a jury before determining the defendants' equitable defenses. *See Bostic v. Goodnight*, 443 F.3d 1044, 1049 (8th Cir. 2006).

SMRI contends that the district court could not consider the equitable defenses for another reason: When the defendants asked the court to determine their defenses, they did so in a filing that they styled a Rule 52 motion to make findings and amend the judgment. SMRI asserts that the filing was defective since its supporting brief was filed after the time limit set forth in Federal Rule of Civil Procedure 52(b). But that time limit applies only to motions to amend the findings that a district court has made "[i]n an action tried on the facts without a jury or with an advisory jury." *See* Fed. R. Civ. P. 52(a)(1). The rule plainly did not apply here because the legal claims had been tried to a jury. The mere fact that the defendants mislabeled their filing does not mean that it is subject to the rules that apply to that label. *See Jackson v. Schoemehl*, 788 F.2d 1296, 1298 (8th Cir. 1986).

The district court thus properly considered the defendants' equitable defenses, and we review its decision to apply the defenses of laches and acquiescence for an abuse of discretion. *Champagne Louis Roederer v. J. García Carrión, S.A.*, 569 F.3d 855, 858 (8th Cir. 2009). SMRI asserts that the district court abused its discretion in applying those equitable defenses because the jury's finding that the defendants had willfully infringed SMRI's marks was equivalent to a finding that they had unclean hands and thus could not receive equitable relief. *See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). To bind the district court's equitable powers, a jury's findings must be on an issue "common" to the action's legal and equitable claims; otherwise, the court is free to treat the jury's findings as "merely

advisory" under Federal Rule of Civil Procedure 39(c). *See Smith Flooring, Inc. v. Pa. Lumbermens Mut. Ins. Co.*, 713 F.3d 933, 938–39 (8th Cir. 2013); *see also Brown v. Ala. DOT*, 597 F.3d 1160, 1184 & n.11 (11th Cir. 2010). If the jury's findings were on a common issue, the court, in fashioning equitable relief, "may take into account facts that were not determined by the jury, but it may not base its decision on factual findings that conflict with the jury's findings." *SEC v. Capital Sols. Monthly Income Fund, LP*, 818 F.3d 346, 354 (8th Cir. 2016).

Whether the findings of the court and the jury are about a "common" issue may not be obvious on their face. Here, for example, one might surmise that the issue of willfulness was common to both SMRI's claim for damages, *see* 15 U.S.C. § 1117(a), and its equitable defense against the defendants' own equitable defenses, *see Osborn v. Griffin*, 865 F.3d 417, 451 (6th Cir. 2017), because they both turned on whether the defendants' infringement of SMRI's marks had been willful. (Since the parties assume that the jury's willfulness findings concerned a legal issue, we assume the same.) But willfulness, as we observed, is a multifarious concept like causation or intent: The definition of willfulness that the district court gave the jury was only one of the many that courts have used. *W. Diversified Servs.*, 427 F.3d at 1273–74. So it is possible that the legal issue of willfulness in this case, *i.e.*, for purposes of § 1117(a), was distinct from the equitable issue, *i.e.*, for purposes of unclean hands. Some courts have held that this area of law is "already [so] complex" that the equitable definition of willfulness should simply mirror the statutory definition. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 957 (9th Cir. 2001). We see no reason to cede the definition of an equitable term over to a statute simply because they use the same word. The district court, for example, found that the defendants had used the word "Sturgis" in the good faith belief that SMRI's "Sturgis" word mark was invalid. It is possible that the court's finding did not conflict with the jury's finding that the defendants' use of the word was willful in the sense that they had acted with "the conscious intent to benefit from the goodwill or reputation" associated with it. The jury was not asked to find that the defendants had known that their conduct constituted unlawful infringement, *cf. id.*, but only that they had intended to benefit from the word mark's goodwill or reputation.

A defendant, however, can intend to benefit from the goodwill associated with a word—"Sturgis," for example, as a fun and memorable motorcycle rally—without intending to infringe a valid mark based on the word. So some courts have made clear that when a party "uses an intellectual property in the face of disputed title," the party's use of it, if in good faith, does not constitute "willful infringement." *See id.* at 959.

Even if willfulness was a common issue, there are at least two reasons why the district court's findings supporting equitable relief might not have conflicted with the jury's findings that their trademark infringement—specifically, of the Monahan mark and the "Sturgis Bike Week" mark, which are the only two left in this case—had been willful. First, even if the defendants engaged in "willful act[s] concerning the cause of action which rightfully can be said to transgress equitable standards of conduct," the district court may still have the discretion not to apply the doctrine of unclean hands. *See Precision Instrument Mfg. Co.*, 324 U.S. at 815. We have observed in other contexts that the unclean-hands defense may be invoked only against a party that has committed wrongdoing "of serious proportions," *see Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992), indicating that it might not be sufficient that the wrongdoing was willful if it was not also substantial to an appropriate degree. *Cf. Pfizer, Inc. v. Int'l Rectifier Corp.*, 538 F.2d 180, 195 (8th Cir. 1976). Other courts have stated as much, holding that unclean hands do not preclude the application of an equitable defense unless the plaintiff proves that the defendant has "engaged in particularly egregious conduct." *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1361 (Fed. Cir. 2008). We agree that the fact that a defendant was a willful infringer does not necessarily preclude the district court from granting the defendant equitable relief from an infringement claim. *See Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 615 (7th Cir. 1965). Equity demands flexibility and eschews mechanical rules. *Holland v. Florida*, 560 U.S. 631, 649–50 (2010). In an appropriate case, a district court might determine that the defendant's willful infringement was sufficiently minor compared to the plaintiff's delay and acquiescence that the balance of the equities still favors the defendant. *See Tisch Hotels*, 350 F.2d at 615.

Second, the district court could conclude that the jury's willfulness findings do not have record support. Although the court did not address those findings in largely denying the defendants' motion for judgment as a matter of law, the court later held, in granting the equitable defenses, that SMRI did not carry "its burden of proving that [defendants] subjectively and knowingly intended to use [their marks] for purpose of deriving benefit from [SMRI's] goodwill" (alterations in original). If the court meant that the record did not support the jury's findings that the defendants had infringed SMRI's marks "with the conscious intent to benefit from [its] goodwill or reputation," then the court would have been free (assuming it was correct about the insufficiency of the evidence) to make its own finding to the contrary. We have held that the record supported the jury's finding that the defendants willfully infringed the Monahan mark, but we have not ruled on whether the record supported the jury's finding that they also willfully infringed the "Sturgis Bike Week" mark.

We raise the above possibilities simply to make clear that equitable relief may be available to the defendants here and thus that a remand on the issue would not be futile. A remand is appropriate here because the district court's order granting the equitable defenses relied in part on its findings that Rushmore had sold rally-related products bearing the word "Sturgis" to both the Chamber and its agents. The district court was entitled to infer that the Chamber (and, by extension, SMRI) knew that Rushmore was selling infringing goods to the Chamber itself and its agents. But since we have held that rally-related products using the word "Sturgis" were not infringing, it is no longer clear whether the district court would conclude based on the evidence remaining that acquiescence and laches still apply. We thus vacate the district court's order granting those defenses. SMRI points out that the district court applied those defenses to non-Lanham Act claims without discussing whether or why they apply. If the district court determines after further fact-finding on remand that the equitable defenses apply, it should provide a "clear understanding" of the basis of its decision by setting forth in its order why each defense applies to each co-defendant and claim. *See Rille v. PricewaterhouseCoopers LLP*, 803 F.3d 368, 374 (8th Cir. 2015) (en banc).

SMRI also contests various aspects of the district court's permanent injunction against the defendants. SMRI says that the district court abused its discretion by not enjoining the defendants from selling anything that uses the word "Sturgis," including presumably a state map, but that argument has been mooted by the overturning of the jury's finding that the "Sturgis" mark is valid. The same goes for SMRI's argument that the district court improperly used judicial notice in allowing the defendants to use the term "Legendary Sturgis" on non-rally-related products. Since the injunction on using that term on rally-related goods could only have been premised on the "Sturgis" mark, this argument is also moot. On remand, the district court must modify its order providing SMRI with permanent injunctive relief to account for the fact that we have reversed the jury's findings that SMRI's "Sturgis" mark and its unregistered marks are valid. We reject SMRI's contention that the defendants have waived their ability to challenge the permanent injunctive relief that the district court may order.

The district court denied SMRI an award of attorney's fees under 15 U.S.C. § 1117(a), and we hold that the district court did not abuse its discretion in finding that SMRI's case was not "exceptional" with respect to either the "substantive strength of [its] litigating position" or "the unreasonable manner in which the case was litigated." *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). We also conclude that SMRI has not shown any reversible error in the district court's handling of its motion for the taxing of costs. *See* Fed. R. Civ. P. 61. Since we have reversed several parts of the jury's verdict, the parties and the district court may wish to revisit on remand the issue of the awarding of costs and fees.

VI

In conclusion, we affirm the district court's denial of judgment as a matter of law to the defendants on SMRI's claims of deceptive trade practices, false advertising, and unfair competition, and also on its trademark-infringement claims pertaining to its "Sturgis Bike Week" and Monahan marks. We also affirm the court's granting of judgment as a matter of law to co-defendant JRE, Inc. We vacate the judgment below as to SMRI's cybersquatting claim and remand it for a new trial. Since SMRI did not

provide the jury with sufficient proof that its "Sturgis," "Sturgis Motorcycle Rally," and "Sturgis Rally & Races" marks are valid, we reverse the judgment below as to the infringement claims pertaining to those marks and also the related trademark-dilution claim. We reverse as well the judgment below as to the counterfeiting claim involving the Monahan mark. We vacate the district court's order granting equitable relief to the defendants, and we direct the district court to modify its order granting permanent injunctive relief to SMRI in light of our reversal of several parts of the jury's verdict. We also affirm the district court's orders denying attorney's fees, but awarding limited costs, to SMRI.

We remand the case for further proceedings consistent with this opinion.

_____